UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

KENNETH W. ROBERTSON,        )
                             )
        Plaintiff,           )
                             )        No.  1:06CV00108 FRB
                             )
v.                           )
                             )
                             )
MICHAEL J. ASTRUE,           )
Commissioner of Social Security,[1]  )
                             )
        Defendant.           )

**MEMORANDUM AND ORDER**

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural Background**

On May 28, 2004, Mr. Kenneth W. Robertson ("plaintiff") protectively filed an application for Supplemental Security Income payments, alleging that he became disabled on December 4, 2002. (Administrative Transcript, "Tr.", at 49-51.) Plaintiff's application was initially denied on September 29, 2004. (Tr. 35-

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he shall be substituted for Acting Commissioner Linda S. McMahon, and former Commissioner Jo Anne B. Barnhart, as defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

39.)  Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"), which was marked received by defendant Agency's Office of Hearings and Appeals on October 19, 2004. (Tr. 34.) On December 1, 2005, a hearing was held before an ALJ in Cape Girardeau, Missouri, during which plaintiff testified and was represented by attorney David Throesch. (Tr. 11-17; 182-205.) On February 24, 2006, the ALJ issued a decision unfavorable to plaintiff. (Tr. 8-17.) Plaintiff filed a request for review of that decision with defendant Agency's Office of Hearings and Appeals on March 3, 2006, and the Appeals Council denied plaintiff's request for review on June 22, 2006. (Tr. 2-6.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  **Evidence Before the ALJ**

### A.  <u>Plaintiff's Testimony</u>

At the hearing on December 1, 2005, plaintiff responded to questioning from the ALJ. Plaintiff was born on March 8, 1955, and was 50 years old at the time of the hearing. (Tr. 186.) Plaintiff testified that he is single, and lives in a one-level rental house with his girlfriend, Ms. Paula Jordan. (Tr. 187.) Plaintiff completed the tenth grade, and did not attend special education classes. (Tr. 187-88.) Plaintiff completed no other schooling or training. (Tr. 188.) Plaintiff is able to read and write. <u>Id.</u> Plaintiff is five feet, nine inches tall, and weighs

225 pounds, an increase from his 1999 weight of 175 pounds. (Tr. 188-89.) Plaintiff is right-handed. (Tr. 189.)

Under questioning from his attorney, plaintiff testified that he was working as a painter in August of 1999 when he became dizzy and "had a light heart attack." (Tr. 190, 198.) Plaintiff testified that he was taken to the Emergency Room, was hospitalized for five or six days, and underwent several tests. (Tr. 190.) Plaintiff testified that he was not placed on medication following this hospitalization. (Tr. 191.) About one month following his discharge, plaintiff attempted to return to work as a painter, but quit after two or three days due to numbness in his arm, pain in his shoulder, and dizziness. (Tr. 191-92.) Plaintiff testified that he was currently under cardiac treatment by a doctor at a medical clinic in Pleasantville, Missouri. (Tr. 192.) Plaintiff's attorney indicated that he had been trying unsuccessfully to obtain those records and requested additional time to continue those efforts, a request the ALJ granted. Id. Plaintiff also testified that he was scheduled to see an unnamed medical provider regarding "cancer spots" on his lung. (Tr. 193.)

Plaintiff testified that he has trouble breathing, and is often short-winded. Id. When asked what heart-related problems he was having, plaintiff testified: "Just tightness and a press and the blood flow to my legs, if I don't get enough blood down there, then they swell up, and I can't stand up very long at a time." (Tr. 194-95.) Plaintiff also testified that he "sometimes"

-3-

suffered chest pains for which he took Nitroglycerin, which he began taking in 2002. (Tr. 191, 195.) When asked how often he used Nitroglycerin, plaintiff responded "[o]nly when I have chest pains." (Tr. 195.) Further questioning revealed that this occurred "probably twice a month." Id. Plaintiff testified that his chest pain was exacerbated by exertion such as walking and lifting, and he stated that he could walk 50 to 100 yards before experiencing chest pain. Id. Plaintiff testified that the Nitroglycerin caused a temporary light-headed feeling. Id.

Plaintiff testified that, as a child, he suffered the loss of some of his toes in a lawnmower accident. (Tr. 196.) Plaintiff testified that the absence of these toes causes him to walk differently, resulting in pain on the left side of his back. (Tr. 196-97.) Plaintiff testified that he can only lift five or ten pounds before suffering back pain. (Tr. 196.) Plaintiff takes two Nuprin tablets daily to manage his back pain. (Tr. 197.) Plaintiff also testified that he had been diagnosed with Hepatitis C, which has caused weakness in his joints, muscles and legs. Id.

Plaintiff's work history was spotty, and included self-employment, employment for one year as a maintenance manager with an apartment complex called Lindsey Management, and employment for ten years with City Vault Ceiling. (Tr. 199.) When asked why he did not work steadily, plaintiff replied that "there just wasn't much work going off when I was able." (Tr. 199-200.)

The ALJ then questioned plaintiff regarding his daily

-4-

activities. (Tr. 200-201.) Plaintiff testified that he rises at 7:30, takes his medicine, walks outside to feed his dogs, watches television, and takes out the garbage. (Tr. 201.) Plaintiff can no longer engage in his former hobby of mechanic work. Id. Plaintiff testified that he does not leave the house during the day, specifically stating that Paula takes the car and goes to work, and that when she returns home, he accompanies her to the store. Id. Plaintiff stated "I have no other way to go." Id.

Plaintiff's attorney then called Paula Jordan to the stand. (Tr. 201-202.) Ms. Jordan testified that she has been in a relationship with plaintiff for four years, and that plaintiff has not worked at all during that time. (Tr. 202.) She testified that plaintiff was "always hurting" in his "whole body", either his arm, chest or back. Id. She also testified that plaintiff occasionally cleaned up the house for her. (Tr. 203.) Ms. Jordan's salary was their only income. Id.

Following the hearing, the ALJ held the record open for 45 days to await receipt of updated medical information. (Tr. 204.) Under cover dated December 6, 2005, plaintiff's attorney submitted the records from Extended Health Systems Medical Clinic, Dr. Muhammad Azharuddin, dated February 24, 2003 through November 20, 2005. (Tr. 107-121.)

B. <u>Medical Records</u>[2]

Records from Crittenden Memorial Hospital in West Memphis, Arkansas, indicate that plaintiff presented to the Emergency Room on June 8, 1999 with complaints of vague, somewhat nondescript mid and left substernal chest pain which occurred while he was at work. (Tr. 173-74.) Plaintiff reported becoming suddenly dizzy, and felt he was experiencing a near-syncopal episode. (Tr. 173.) Upon exam, plaintiff was noted to be in apparent distress, but had a normal cardiac rate and rhythm, and a normal exam. (Tr. 173-74.) An initial EKG revealed a relatively slow heart rate with no ischemic or hyper-acute changes, and subsequent EKGs were non-diagnostic and revealed no evolutionary changes. (Tr. 174.) A chest x-ray revealed mild hyperinflation, a finding consistent with chronic obstructive pulmonary disease. <u>Id.</u> The chest x-ray revealed no acute cardio-pulmonary pathology. <u>Id.</u> Plaintiff was admitted to the Special Care Unit, Nitroglycerin was administered, and plaintiff was evaluated and followed by Bennett Rudorfer, M.D. <u>Id.</u> Upon exam, Dr. Rudorfer found plaintiff to be in no acute distress, his heart rate was normal, and he had no edema. (Tr. 176.) An ECG was normal. (Tr. 177.)

---

[2]The administrative record includes six pages of materials, which are apparently summaries prepared by plaintiff, of the medical records of the following providers: Jonesboro Church Health Care Center, Dr. Fraser M. Richards, Dr. Steven Gubin, Crittenden Memorial Hospital, and Dr. Bennett Rudorfer. (Tr. 122-27.) Because the medical information contained in these summaries is available via the actual medical records from the providers themselves, the undersigned has herein discussed the medical information as it is reported in those records, not in the prepared summaries.

Dr. Rudorfer recommended a follow-up echocardiogram and an exercise stress test. Id. Upon discharge, it was noted that myocardial infarction had been ruled out. (Tr. 172.)

Plaintiff next sought medical treatment on October 1, 2002 with G. Bindra, M.D. (Tr. 163.) Plaintiff complained of episodic nose bleeds with accompanying nausea, episodic dizziness preceded by headache, and pressure in his ears followed by nausea. Id. Plaintiff denied any other major medical problems. Id. Plaintiff's physical exam was normal, and he was noted to be in no apparent distress with stable vital signs. Id. Dr. Bindra opined that plaintiff's symptoms could be related to Meniere's syndrome.[3] Id.

On October 2, 2002, plaintiff saw Steven Gubin, M.D. in follow-up, with complaints of numbness in his extremities, occasional pain in both arms, and lower extremity edema. (Tr. 162.) Plaintiff gave a history of nosebleeds, and further reported that his symptoms began two months ago and occurred regardless of his exertion level. Id. An EKG showed normal sinus rhythm, normal axis and no acute changes. Id. Dr. Gubin's impression was numbness, associated arm pain and edema. Id.

Plaintiff returned to Dr. Bindra on October 8, 2002 and reported doing "much better" with no recurrence of nosebleeds, but

_____

[3]Meniere's syndrome is an inner ear disorder characterized by recurrent attacks of dizziness, ringing in the ears, and hearing loss. http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=Meniere's

that he still suffered from headaches and also suffered fluctuating blurring of his vision. (Tr. 161.) Upon exam, Dr. Bindra noted post nasal drip, and further noted good pressure in plaintiff's eustachian tubes. <u>Id.</u> Dr. Bindra prescribed Chlor-Trimeton,[4] saline nose drops, and a consultation with an eye doctor. <u>Id.</u>

Plaintiff returned to Dr. Gubin on October 23, 2002 for follow-up, and reported that he still had some chest pain and some shortness of breath. (Tr. 160.) Dr. Gubin noted that plaintiff's recent echocardiogram showed no abnormalities but that, because of plaintiff's continued symptoms, plaintiff should undergo an outpatient cardiac catheterization to rule out the possibility of underlying coronary artery disease. <u>Id.</u>

Records from Extended Health Systems Medical Clinic, which were forwarded to the ALJ following the administrative hearing, indicate that plaintiff was seen on February 24, 2003 by Muhammad Azharuddin, M.D., with complaints of a sore throat, cough producing bloody sputum, and sores on his tonsils. (Tr. 119.) Plaintiff indicated that he was taking Aspirin and Tylenol, and apparently did not report taking Nitroglycerin. <u>Id.</u> Dr. Azharuddin noted plaintiff's history of "on and off" leg swelling and chest pain with exertion for the past three years. <u>Id.</u> Upon exam, Dr. Azharuddin noted bilateral leg edema and an inflamed

---

[4]Chlor-Trimeton, or Chlorpheniramine, is an antihistamine which relieves red, itchy, watery eyes, sneezing, and runny nose caused by allergies, hay fever, and the common cold.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682543.html

pharynx. (Tr. 121.) Dr. Azharuddin diagnosed plaintiff with an acute viral respiratory infection, pharyngitis, laryngitis, and bronchitis, and prescribed an antibiotic, Tylenol, cough medicine, and rest. Id. (Tr. 119-21.)

Records from Jonesboro Church Health Center indicate that plaintiff was seen on July 20, 2004 with complaints of chest pain, leg edema, shortness of breath, dizziness, and "arthritis - every joint on my body." (Tr. 154.) Plaintiff gave a history of a "light MI" in 1999, and reported that he had been told to undergo a cardiac catheterization and stent, but that he had not obtained disability or medicaid to cover the cost, and these procedures had therefore not been done. Id. Plaintiff also reported that he had COPD (chronic obstructive pulmonary disease) "on all the papers." Id. Plaintiff reported taking Nitroglycerin. Id. Upon exam, plaintiff was noted to be sweating profusely, with non-pitting edema on his legs. (Tr. 154.) Plaintiff was referred for a dobutamine stress echocardiogram. Id.

On July 26, 2004, plaintiff was seen by Maynard L. Sisler, M.D., on referral from Missouri Disability Determinations for an internist physical examination. (Tr. 155-57.) Plaintiff complained of pain upon exertion in his substernal area radiating to his neck and down his arm, and reported taking Nitroglycerin twice monthly. (Tr. 155.) Plaintiff also reported chronic cough with occasional bloody sputum, wheezing, and swelling and cramping in his feet and ankles. Id. Physical examination revealed lungs

clear to percussion and auscultation, and a normal-sized heart with no clicks, rubs, murmurs or gallop. (Tr. 156.) Plaintiff's back and extremities showed no cyanosis, clubbing, diminished pulses or edema. Id. Range of motion of the cervical spine was limited, and there was pain at the extremes of motion in both knees and hips. Id. Plaintiff was noted to be able to move on and off the examination table with ease, and was able to forward flex to touch his toes. Id. He bore weight on either leg, walked on his heels and toes, squatted and arose from a squatting position without difficulty. (Tr. 156.) Grip strength was strong and equal bilaterally. (Tr. 157.) Dr. Sisler concluded that plaintiff had a strong family history of heart disease, ongoing chest pain and dyspnea, some musculoskeletal problems, and nervousness and depression. Id.

On August 12, 2004, plaintiff was admitted to St. Bernard's Medical Center in Jonesboro, Arkansas, by William Hurst, M.D., to undergo a dobutamine stress echocardiogram. (Tr. 150-51.) The test was markedly positive clinically and echo-cardiographically, but not electrocardiographically. (Tr. 151.) It was noted that cardiac catheterization was clearly indicated. Id.

On August 24, 2004, Fraser M. Richards, M.D. admitted plaintiff to the "One Day Surgery" department of St. Bernard's Medical Center in Jonesboro, Arkansas for a cardiac catheterization. (Tr. 128-29; 141-43.) Plaintiff reported

intermittent and recurrent chest pain, and dyspnea (labored breathing) and fatigue upon exertion. (Tr. 128, 141.) Dr. Richards noted that plaintiff's cardiac catheterization yielded normal results, and opined that plaintiff's chest pain was "noncardiac in origin" and could potentially be gastrointestinal or musculoskeletal in nature. (Tr. 136, 144.) Dr. Richards noted that plaintiff had mild exertional dyspnea and may warrant pulmonary evaluation, but that there was no indication for cardiology follow-up. Id.

On September 28, 2004, plaintiff underwent a physical Residual Functional Capacity ("RFC") Assessment. (Tr. 73-80.) It was determined that plaintiff retained the RFC to occasionally lift 20 or more pounds and frequently lift 10; stand, walk and sit for a total of six hours in an eight-hour day, and push and pull without limitation. (Tr. 74.) It was noted that plaintiff complained of a heart condition, lung disease, "bad legs," three missing toes, foot swelling, dizziness, and headaches. Plaintiff's August 24, 2005 cardiac catheterization, which yielded normal results, was noted. Id. It was noted that plaintiff's chest pain was "noncardiac" in origin. On exam, plaintiff's lungs were clear to percussion and auscultation, his heart was not enlarged, and had a normal rhythm, with no clicks, rubs, murmurs or gallop. (Tr. 75.) Plaintiff's cervical spine range of motion was limited, and plaintiff had pain at the extremes of motion in both knees and hips. Id. Plaintiff was noted to be able to mount and dismount

-11-

the examination table with ease, and could forward flex to touch his toes.  Id.  It was noted that plaintiff's statements regarding his limited ability to cook, bathe, walk and rise from a sitting position, and his statement that he shopped only twice per month for 20 minutes, was considered only partially credible based on the other substantive evidence in the file.  Id.

On September 29, 2004, Holly L. Weems, Psy.D., completed a Psychiatric Review Technique form.  (Tr. 81-93.)  Dr. Weems observed that, although plaintiff complained of anxiety and depression and had indeed been diagnosed with depression, he had neither sought treatment nor taken medication for any psychiatric disturbance.  (Tr. 93.)  Dr. Weems noted that plaintiff stated he did no cooking or chores, drove without difficulty, shopped twice per month, visited with family approximately three times per week, and had no trouble getting along with others.  Id.  Dr. Weems concluded that plaintiff was limited due to his physical complaints only, and that his diagnosis of depression did not appear to impose significant functional limitations, and was therefore non-severe. Id.  Dr. Weems opined that plaintiff had mild limitations in terms of activities of daily living, but no limitations in maintaining social functioning or maintaining concentration, persistence, or pace.  Id.

The record indicates that plaintiff was examined by a Division of Family Services ("DFS") physician on September 18, 2005.  (Tr. 53-54.)  The DFS physician noted plaintiff's diagnoses

-12-

as ischemic cardiomyopathy, congestive heart failure, obesity, and hypertension, and noted that plaintiff was unable to work and was not getting adequate medical care. (Tr. 54.)

Records from Extended Health Systems Medical Clinic indicate that plaintiff was seen on November 3, 2005 with complaints of tooth pain, headache, and sore throat, and also shortness of breath and pain upon exertion. (Tr. 115-16.) Upon exam, plaintiff's chest was clear to auscultation, and he was noted to have a regular cardiac rate and rhythm. (Tr. 115.) Plaintiff was diagnosed with pharyngitis, an apparent dental problem, hyperlipidemia, and hypertension. Id. Plaintiff was prescribed Augmentin,[5] Naprelan,[6] and Lisinopril.[7] Id. Chest x-rays performed on November 8, 2005 revealed probable granulomas in both of plaintiff's lungs. (Tr. 111.) Plaintiff was seen again in follow-up on November 11, 2005. (Tr. 110.) Upon exam, plaintiff's chest was clear to auscultation, and he had a regular cardiac rate and rhythm. Id. It was noted that plaintiff's hypertension was not well controlled. Id. A CT scan of plaintiff's chest, performed on November 18, 2005, revealed two lesions in the right hemithorax.

---

[5]Augmentin is used to treat a variety of bacterial infections. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a685024.html

[6]Naprelan is a non-steroidal anti-inflammatory medication used to treat pain, tenderness, swelling and stiffness caused by, inter alia, different forms of arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

[7]Lisinopril is used either alone or in combination with other drugs to treat hypertension. http://www.nlm.nih.gov/medlineplus /druginfo/medmaster/a692051.html

(Tr. 109.)  On November 20, 2005, plaintiff was seen again in follow-up with complaints of upper neck pain, but reported feeling better and tolerating his medication.  (Tr. 108.)  Upon exam, plaintiff's chest was clear to auscultation, and he had a regular cardiac rate and rhythm.  Id.  It was noted that his hypertension was not well controlled, and his Lisinopril dosage was increased.

**III.     The ALJ's Decision**

The ALJ in this matter found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability, and that plaintiff had the "severe" impairments of ischemic cardiomyopathy and degenerative joint disease.  (Tr. 16.)  The ALJ found that plaintiff's medically determinable impairments were not of listing-level severity, and concluded that plaintiff was unable to perform his past relevant work, but retained the residual functional capacity for a wide range of light work.[8]  Id.  Specifically, the ALJ found that plaintiff could lift ten pounds frequently and 20 pounds occasionally, and could sit, stand or walk for at least six hours in an eight-hour day, but could never climb ladders, ropes or scaffolds.  Id.  The ALJ also found that plaintiff's capacity for light work was substantially intact and not compromised by any non-exertional limitations.  (Tr.

---

[8]Light work involves the following activities:  lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a good deal of walking or standing; or sitting most of the time with some pushing and pulling of arm or leg controls.  20 C.F.R. §§ 404.1567(b), 416.967(b).

-14-

17.)

In analyzing plaintiff's credibility, although the ALJ failed to cite <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), he specifically stated that he had considered all of plaintiff's alleged symptoms, including pain, and the extent to which such symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 416.929 and Social Security Ruling 96-7p, both of which correspond with <u>Polaski</u> and credibility determination. <u>See</u> (Tr. 13-14.) The ALJ further stated that he had considered all statements from medically acceptable sources which reflected judgments about the nature and severity of plaintiff's impairments and his resulting limitations in accordance with 20 C.F.R. § 416.927 and Social Security Rulings 96-2p and 96-6p. (Tr. 14.) The ALJ then set forth inconsistencies in the record to support his conclusion that plaintiff's subjective complaints were not credible. <u>Id.</u>

Following his analysis, the ALJ concluded that, although plaintiff's residual functional capacity precluded the performance of his past relevant work, plaintiff retained the residual functional capacity to perform substantially all of the requirements of light work. (Tr. 14-15.) The ALJ then stated that, considering plaintiff's age, education and work experience, a finding of "not disabled" was supported by the Medical-Vocational Guidelines; specifically Medical-Vocational Rule 202.11. (Tr. 16.)

## IV. Discussion

To be eligible for Social Security disability benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001);  Baker v. Secretary of Health & Human Services, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  It provides disability benefits only to persons who are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  It further specifies that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(A)(B);  Bowen v. Yuckert, 482 U.S. 137, 140 (1987);  Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the

Commissioner utilizes a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen</u>, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young o/b/o Trice v. Shalala</u>, 52 F.3d 200 (8th Cir. 1995), <u>citing</u> <u>Woolf</u>

<u>v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ;

2.   The plaintiff's vocational factors;

3.   The medical evidence from treating and consulting physicians;

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.   Any corroboration by third parties of the plaintiff's impairments;

6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

<u>Stewart v. Secretary of Health & Human Services</u>, 957 F.2d 581, 585-86 (8th Cir. 1992), <u>quoting</u> <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991); <u>see also</u> <u>Briggs</u>, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because

substantial evidence also supports a different outcome. <u>Briggs</u>,
139 F.3d at 608; <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir.
1992), <u>citing</u> <u>Cruse</u>, 867 F.2d at 1184.

In the case at bar, plaintiff claims that the ALJ's
decision is not based upon substantial evidence on the record as a
whole. In support, plaintiff argues that the ALJ's RFC
determination is in error because it is not supported by the
record, and because the ALJ improperly considered plaintiff's daily
activities. Plaintiff also argues that the ALJ erred by failing to
acknowledge all of his alleged non-exertional impairments, and by
using the Guidelines to direct a finding of "not disabled."
Plaintiff finally argues that the ALJ's decision was in error
because it lacked vocational expert testimony. In response, the
Commissioner argues that the ALJ's decision is supported by
substantial evidence on the record as a whole.

A.   <u>Residual Functional Capacity Determination</u>

As set forth, <u>supra</u>, the ALJ in this case determined that
plaintiff retained the residual functional capacity to perform
substantially all of the requirements of light work. As noted,
<u>supra</u>, plaintiff argues that the ALJ's RFC determination was in
error. A review of the ALJ's decision shows that it is supported
by substantial evidence on the record as a whole.

Residual functional capacity is what a claimant can do
despite his limitations. 20 C.F.R. § 404.1545, <u>Lauer v. Apfel</u>, 245
F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's

RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

In making his RFC findings, the ALJ conducted an exhaustive review of the medical evidence of record. The ALJ noted that, although plaintiff testified that he had suffered a "light heart attack" in June 1999, the hospital records in fact indicated that myocardial infarction had been ruled out. (Tr. 12.) The ALJ noted plaintiff's evaluation by Dr. Gubin, which included a normal

echocardiogram. (Tr. 13.) The ALJ also discussed plaintiff's evaluation by Dr. Sisler, who noted no abnormal findings related to plaintiff's cardiac health despite plaintiff's ongoing complaints of chest pain. Id. The ALJ noted that, although plaintiff's dobutamine stress echocardiogram was partially "markedly positive", his subsequent cardiac catheterization was unremarkable. Id. The ALJ noted the conclusion (of Dr. Richards) that plaintiff's chest pain was "noncardiac in origin" and may instead be related to gastrointestinal or musculoskeletal issues, and that no cardiology follow-up treatment was required. Id. The lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition has been observed to be "the strongest support in the record" for the ALJ's finding of no disability. Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996).

Furthermore, the ALJ noted that, although the DFS examiner opined that plaintiff was unable to work, that opinion seemed to be based upon the fact that plaintiff was not receiving medical care, and there was no evidence in the record that plaintiff had ever actually sought such medical care and been refused. (Tr. 13, 14); see Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (alleged pain and disability are inconsistent with failure to seek low-cost or no-cost medical treatment). Furthermore, because the DFS examiner examined plaintiff on only one occasion, his opinion cannot constitute substantial evidence to support a conclusion that plaintiff is unable to work. See Singh

v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Nevland, 204 F.3d at 857 ("The opinion of a consulting physician who examines the claimant once ... does not generally constitute substantial evidence.")).    In addition, the ALJ found it significant that plaintiff did not seek regular medical treatment specifically for any of his allegedly disabling impairments.  (Tr. 14); see Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (failure to seek treatment may be inconsistent with disability); McClees v. Shalala, 2 F.3d 301, 302-03 (8th Cir. 1993) (ALJ properly denied benefits to claimant who was seeking them for period during which claimant did not seek medical treatment, other than for a skinned elbow, and during which claimant was not taking pain medication).

In addition, the undersigned notes that the medical evidence of record fails to document that plaintiff frequently took strong prescription pain medication.    In fact, according to plaintiff's testimony and according to the records of Dr. Sisler, plaintiff only took Nitroglycerin when he experienced chest pain, which was approximately twice per month.  (Tr. 155, 195); See Rankin v. Apfel, 195 F.3d 427, 429 (8th Cir. 1999) (infrequent use of prescription drugs supports discrediting complaints); Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994) (the lack of strong pain medication is inconsistent with allegations of disabling pain). Finally, it is notable that none of plaintiff's treating physicians ever opined that plaintiff was totally disabled from work.    See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (finding lack of

significant restrictions imposed by treating physicians supported ALJ's determination of no disability).

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence on the record as a whole. The ALJ based his decision on all of the relevant, credible evidence of record, and properly declined to give controlling weight to the opinion of the DFS physician. For the foregoing reasons, the undersigned finds that the ALJ's determination of plaintiff's residual functional capacity was based upon substantial evidence on the record as a whole.

### 1. Non-Exertional Impairments

The undersigned turns to plaintiff's contention that the ALJ failed to properly consider his non-exertional impairments, including pain, in formulating his RFC. In this case, the ALJ thoroughly analyzed and discussed the medical evidence of record, analyzed plaintiff's subjective complaints of pain and limitations precluding all work, and found such allegations to be less than credible. As previously noted, although the ALJ failed to cite Polaski, he did cite 20 C.F.R. § 416.929 and Social Security Ruling 96-7p, both of which correspond with Polaski and credibility determination.[9] See (Tr. 13-14.)

---

[9]Although plaintiff does not specifically allege that the ALJ's credibility determination ran afoul of Polaski, the undersigned will address that issue here because it is crucial to this Court's review of the ALJ's RFC determination and his determination that plaintiff's RFC was not compromised by any non-exertional

"A claimant has the burden of proving that his disability results from a medically determinable physical or mental impairment." Polaski, 739 F.2d at 1321. However, testimony regarding pain is necessarily subjective in nature, as it is the Plaintiff's own perception of the effects of his alleged physical impairment. Id.; Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski, 739 F.2d at 1321-22. The Eighth Circuit addressed this difficulty in Polaski, and established the following standard for the evaluation of subjective complaints:

> "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions."

Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations

limitations.

alone, he may discount such complaints if there are inconsistencies in the evidence as a whole.  Id.  The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working.  Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).  When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject .  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In the instant matter, the ALJ set forth numerous inconsistencies in the record to support his adverse credibility determination.  The ALJ began his analysis by noting the duration, frequency and intensity of plaintiff's complaints.  The ALJ noted that plaintiff testified that he became "a little light headed" twice per month, had tightness in his chest with occasional pain, and swelling in his legs.  (Tr. 14.)  The ALJ also noted that plaintiff took a Nitroglycerin pill, that he planned to see a doctor for evaluation of "spots" on his lungs, and that he had been diagnosed with Hepatitis C but had sought no treatment.  Id. Similarly, as discussed, supra, plaintiff only took Nitroglycerin when he experienced chest pains, which was "probably twice a month." (Tr. 195.)  A claimant's allegations of disabling pain may

be discredited under this _Polaski_ factor by evidence that the claimant has received minimum medical treatment and/or has taken medications for pain only on an occasional basis. _Cline v. Sullivan_, 939 F.2d 560, 568 (8th Cir. 1991) (citing _Williams v. Bowen_, 790 F.2d 713 (8th Cir. 1986); _see also Kelley v. Callahan_, 133 F.3d 583, 589 (8th Cir. 1998).

The ALJ next focused on plaintiff's poor work record and earnings history. (Tr. 14.) The ALJ noted that an award of benefits would likely result in plaintiff receiving more income than he had earned in most years, and concluded that plaintiff had no financial incentive to return to work. (Tr. 14.) _See Woolf_, 3 F.3d at 1214 (a claimant's credibility is lessened by a poor work history).

The ALJ then noted the medical evidence of record, and concluded that there was no evidence that plaintiff sought regular, sustained treatment for his alleged symptoms since 1999, and in fact stated that plaintiff "was not seen at all" from October 2002 until July 2004.[10] (Tr. 14.) The ALJ concluded that the lack of regular, aggressive treatment detracted from the credibility of plaintiff's allegations of impairments precluding all work. _Id._

---

[10]The undersigned notes that, although the ALJ indicated that plaintiff "was not seen at all" from October 2002 until July 2004, the record establishes that plaintiff saw Dr. Azharuddin for treatment for bronchitis on February 24, 2003. (Tr. 14; 119-21.) However, because this treatment record does not indicate that plaintiff was actually treated for any condition he herein alleges is disabling, the undersigned concludes that the ALJ's finding that plaintiff "was not seen at all" from October 2002 until July 2004 does not necessitate a finding that the ALJ's decision was unsupported by substantial evidence.

Indeed, a lack of regular and sustained medical treatment is a basis for discounting physical complaints, and is an indication that the claimant's impairments are non-severe and not significantly limiting for twelve continuous months. <u>Novotny v. Chater</u>, 72 F.3d 669, 671 (8th Cir. 1995); <u>see also Gwathney v. Chater</u>, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for alleged physical and mental impairments contradicted subjective complaints of disabling conditions); <u>Stephens v. Shalala</u>, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (allegations of disabling pain properly discredited when no complaints were made about such pain while receiving other treatment); <u>House v. Shalala</u>, 34 F.3d 691, 694 (8th Cir. 1994) (minimal medical treatment inconsistent with disabling pain); <u>Onstead v. Sullivan</u>, 962 F.2d 803, 805 (8th Cir. 1992) (the absence of ongoing medical treatment is inconsistent with subjective complaints of pain).

In addition, the undersigned notes the ALJ's analysis of the medical evidence of record and the conclusion that it consistently failed to document a medically determinable impairment which would explain plaintiff's subjective symptoms. While the lack of objective medical evidence is not dispositive to the question of a claimant's credibility, it is an important factor. <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257-58 (8th Cir. 1997). Symptoms like those plaintiff herein alleges are non-exertional impairments, "such as pain, fatigue, shortness of breath, weakness,

or nervousness, will not be found to affect [a claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present." 20 C.F.R. § 404.1529(b).

The ALJ also considered plaintiff's daily activities, noting that he reported performing routine household chores such as feeding his dogs, taking out his garbage, and shopping for groceries, and that written statements in the record showed that plaintiff was able to drive. (Tr. 14.) Indeed, the undersigned notes that the evidence of record suggests that plaintiff was able to care for himself, do household chores, drive a car, and perform other miscellaneous activities. In addition, the undersigned notes plaintiff's statement to Dr. Weems that he visited with family approximately three times per week. (Tr. 93.) Furthermore, as the Commissioner notes, it appears that plaintiff is unable to leave the house or drive during the day due to lack of transportation, not disability, inasmuch as he testified that he did not leave the house until his girlfriend returned home from work with the car, stating "I have no other way to go." (Tr. 201.)

The undersigned finds that the ALJ properly considered plaintiff's daily activities as just one factor in his decision-making process. Nothing in the ALJ's decision suggests that plaintiff's daily activities had a decisive effect, or that the ALJ weighed them heavily. Although daily activities alone do not disprove disability, they are a factor to consider in evaluating

subjective complaints.  <u>Wilson v. Chater</u>, 76 F.3d 238, 241 (8th Cir. 1996).

The undersigned further notes that plaintiff's course of treatment was primarily conservative, and no physician ever opined that plaintiff required surgery for any of his alleged impairments. <u>See</u> <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998)(conservative treatment is inconsistent with allegations of disabling pain).

The undersigned finds that the ALJ in this case properly discredited plaintiff's subjective complaints of pain and other alleged non-exertional impairments, having considered the proper factors and undertaken the proper analysis.  If an ALJ discredits a claimant and gives a good reason, the reviewing court will defer to the ALJ's judgment even if every <u>Polaski</u> factor is not discussed in depth.  <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1038 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the reviewing court considers with deference the ALJ's decision on the subject. <u>Tellez</u>, 403 F.3d at 957.

2.  <u>Vocational Expert Testimony</u>

The undersigned finally turns to plaintiff's contention that the ALJ's decision is in error because it lacks the testimony of a vocational expert, which was required due to the presence of non-exertional impairments.  A review of the ALJ's decision reveals no error.

When an ALJ determines, as here, that a claimant is

-29-

unable to return to his past relevant work, the burden shifts to the Commissioner to show that the claimant is able to engage in work that exists in the national economy. <u>Harris v. Shalala</u>, 45 F.3d 1190, 1194 (8th Cir. 1995), <u>citing</u> <u>Sanders v. Sullivan</u>, 983 F.2d 822, 823 (8th Cir. 1992). When only exertional impairments are present, the Commissioner may meet this burden by relying on the Guidelines. <u>Bolton v. Bowen</u>, 814 F.2d 536, 537 n.3 (8th Cir. 1987). In the presence of non-exertional impairments, however, the ALJ may rely upon the Guidelines only if he makes a finding, supported by the record, that "the non-exertional impairment does not significantly diminish plaintiff's residual functional capacity to perform the full range of activities listed in the Guidelines." <u>Harris</u>, 45 F.3d at 1194, <u>citing</u> <u>Thompson v. Bowen</u>, 850 F.2d 346, 349-50 (8th Cir. 1988). Absent such a finding, the Guidelines do not control, and the ALJ must call a vocational expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's abilities. <u>Harris</u>, 45 F.3d at 1194; <u>Sanders</u>, 983 F.2d 822, 823 (8th Cir. 1992); <u>Thompson</u>, 850 F.2d at 350. The Eighth Circuit has provided some guidance in applying this standard:

> In this context "significant" refers to whether the claimant's non-exertional impairment or impairments preclude the claimant from engaging in the full range of activities listed in the Guidelines under the demands of day-to-day life. Under this standard isolated occurrences will not preclude use of the Guidelines, however persistent non-exertional impairments which

> prevent the claimant from engaging in the full
> range of activities listed in the Guidelines
> will preclude the use of the Guidelines to
> direct a conclusion of disabled or not
> disabled. For example, an isolated headache
> or temporary disability will not preclude the
> use of the Guidelines whereas persistent
> migraine headaches may be sufficient to
> require more than the Guidelines to sustain
> the [Commissioner's] burden.

Thompson, 850 F.2d at 350.

As discussed, supra, the ALJ in this case made a finding, which was found herein to be supported by the record, that plaintiff's capacity for light work was not compromised by any non-exertional impairments. Because the ALJ made the proper finding, which was supported by the record, the undersigned finds that vocational expert testimony was not required, and the ALJ's use of the Guidelines to direct a finding of "not disabled" was proper. "Use of the Guidelines is appropriate if the ALJ explicitly discredits subjective allegations of pain for a legally sufficient reason, such as inconsistencies in the record." Bolton, 814 F.2d at 538 (citing Millbrook v. Heckler, 780 F.2d 1371, 1373 (8th Cir. 1985); Tucker v. Heckler, 776 F.2d 793, 796 (8th Cir. 1985).

The undersigned concludes that in the present case, the ALJ's use of the Guidelines was proper. There is substantial evidence in the record to support the determination that plaintiff's alleged non-exertional impairments did not significantly diminish his RFC to perform a wide range of light work. Considering plaintiff's age, education, past work

experience, and the ALJ's proper decision to discount plaintiff's subjective allegations of disabling pain, the undersigned cannot say that the ALJ erred in failing to elicit vocational expert testimony. The ALJ's decision to rely upon the Guidelines and not call a vocational expert is supported by substantial evidence on the record as a whole.

Therefore, for all of the foregoing reasons, the Commissioner's decision is hereby found to have been supported by substantial evidence on the record as a whole, and should therefore be affirmed. Because there is substantial evidence to support the decision, this Court may not reverse merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning</u>, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of August, 2007.